### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


C & H PARTNERSHIP,            )
                              )
                 Plaintiff,    )
                              )
                v.            )     1:04CV00323
                              )
SHAW INDUSTRIES GROUP, INC.,  )
                              )
                 Defendant.    )


### MEMORANDUM OPINION AND ORDER

**Eliason, Magistrate Judge**

### Facts

The issue in this case is whether defendant is liable for rent and expenses due under a commercial lease on property owned by plaintiff. While the issue is straightforward, the facts that created it are less simple and stretch back a number of years into the past.

Plaintiff owns commercial property located at 3738 Chapel Hill Boulevard in Durham, North Carolina. In 1988, it entered into a 120 month lease on that property with New York Carpet World, Inc. (NYCW). The lease had an option to renew for another 60 months. Also, the lease contained a clause restricting assignments of the lease. Of importance to this case, the lease could not be assigned without plaintiff's permission and a change in NYCW's controlling ownership would be considered an assignment of the lease. (Complaint Ex. A. § 13.01)

So far as the record reflects, matters between plaintiff and NYCW proceeded unremarkably until the spring of 1996. In May of

that year, NYCW and defendant entered into a stock purchase agreement with the main goal being the purchase of all of NYCW's stock by defendant. One of the requirements of the agreement was that NYCW "use Reasonable Efforts to obtain estoppel certificates from [landlords such as plaintiff], in each case in form reasonably satisfactory to the parties hereto." (Pl. Brf. Ex. B. § 5.10) It also stated that NYCW would not be liable to defendant if these efforts failed. The agreement did not otherwise describe the "estoppel certificates" or mandate the means to be used to get them.

Apparently in order to comply with the stock purchase agreement, NYCW had an attorney, Richard Bruder, contact the landlords of NYCW's stores. Bruder sent a letter to plaintiff dated June 14, 1996. The letterhead on that letter was for Bruder's firm. The letter itself stated that:

> In connection with the recent stock purchase by Shaw Industries, Inc. of the outstanding stock of New York Carpet World, Inc. (or its affiliates), Shaw Industries has asked us to obtain the enclosed estoppel letter from you. Shaw Industries, Inc., is a billion dollar publicly traded company and is a leading manufacturer of floor covering products.
>
> Please sign the estoppel letter where indicated, fill in the appropriate blanks and return the letter to the undersigned.

(Complaint Ex. B)

Enclosed with the letter was a document (known to the parties as "the estoppel letter") in which plaintiff essentially verified its lease with NYCW, stated that the lease was not in default, stated that neither it nor NYCW had assigned the lease, stated the

-2-

amount of any security deposit, and agreed that the rent was paid. It also acknowledged and consented to the transfer of NYCW's stock to defendant and agreed that the transfer was not an event of default under the lease. Part of this final provision stated that "this [i.e., the transfer] shall in no manner be construed to be a consent to any other transfer or assignment of the Lease." (Id. Ex. C) The document also had plaintiff acknowledge that NYCW and defendant were relying on the contents of the document. The enclosed estoppel letter had a return address of "Shaw Industries, Inc. c/o Richard C. Bruder, Esq." with the law firm's address. The letter clearly identified plaintiff as "Landlord" and NYCW as "Tenant." Handwriting on the estoppel letter, apparently by one of plaintiff's partners, made changes to the letter showing an increased rent payment.

Upon receipt of the letter, plaintiff consulted an attorney and one of its partners searched the internet to determine that defendant was indeed a large corporation. After this consultation and research, it filled in, modified, signed, and returned the letter.

The purchase of NYCW by defendant did occur. However, NYCW did not lose its separate corporate identity, but instead operated as one of defendant's subsidiary corporations. (Def. Brf. Ex. A. ¶ 2) As a subsidiary, it was provided with certain services by defendant over the next few years. One of these services was that defendant procured a HVAC maintenance agreement for the subject property. (Complaint Ex. D) Another was the exercise of the 60-

-3-

month option to renew the lease.  The renewal was sent to plaintiff on October 14, 1997 from defendant on defendant's letterhead.  It identified NYCW as "Tenant" and stated that "Tenant" was electing to exercise the option for the additional period.  The additional lease period extended from April 15, 1998 to April 14, 2003.  (Id. Ex. E)

In November of 1997, NYCW was merged with Shaw Carpet Showplace, Inc., another wholly-owned subsidiary of defendant. Shaw Carpet Showplace, Inc. was the surviving entity in this merger.  Later, in August of 1998, defendant sold Shaw Carpet Showplace to Maxim Group, Inc., an unrelated corporation.  Shaw Carpet Showplace was then merged with CMAX Acquisition, Inc. under the name Maxim Retail Stores.  So far as the record indicates, no transfers or assignments of the lease were performed or requested for any of these transactions.  In June of 2000, Maxim Retail Stores and its parent corporation, Flooring America, Inc., entered Chapter 11 bankruptcy.  (Def. Brf. Ex. A. ¶¶ 6-9)  During the bankruptcy proceedings, plaintiff made a claim for the remainder of the rent due under the lease.  However, it was only partially paid by the bankruptcy trustee.

In order to assert its claim for unpaid rent against defendant, plaintiff contends defendant became an assignee under the lease around the time and in connection with its purchase of NYCW and is, therefore, liable for the unpaid rent and expenses in the amount of $280,459.99 plus interest accruing from April 13, 2003.  Defendant denies this and moves for summary judgment.  In

-4-

deciding that motion, the Court will view the evidence in a light most favorable to the plaintiff. <u>Pachaly v. City of Lynchburg</u>, 897 F.2d 723, 725 (4th Cir. 1990). Summary judgment will be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## **Discussion**

Plaintiff mainly premises defendant's alleged liability under the lease on the idea that the estoppel letter, either alone or in conjunction with other documents in the record, acted as an assignment of the lease. Defendant's response to this is that the estoppel letter or the other documents cannot constitute a binding contract because they fail to satisfy North Carolina's statute of frauds.

The parties appear to agree that North Carolina law controls this case, and the Court will apply that law. In doing so, the Court will rule as it appears the highest state court would rule if presented with the issues. <u>Assicurazioni Generali, S.p.A. v. Neil</u>, 160 F.3d 997, 1002 (4th Cir. 1998).

North Carolina statutory law states that "leases and contracts for leasing lands exceeding in duration three years from the making thereof, shall be void unless said contract, or some memorandum or note thereof, be put in writing and signed by the party to be charged therewith, or by some other person by him lawfully

-5-

authorized." N.C. Gen. Stat. § 22-2. It has long been the law of North Carolina that assignments of leases fall under the statute of frauds and that lease periods and times covered by options to renew count in determining the length of the lease. <u>Herring v. Volume Merchandise, Inc.</u>, 249 N.C. 221, 225, 106 S.E.2d 197, 200 (1958)(assignments of leases for more than three years must be in writing); <u>Wright v. Allred</u>, 226 N.C. 113, 114, 37 S.E.2d 107, 108 (1946)(optional renewal periods are counted).

While the parties frame the dispute as being whether the documents in this case are sufficient to satisfy the statute of frauds, a more basic question would be whether the papers evidence a meeting of the minds so as to constitute a contract wherein defendant agreed to be an assignee under the lease. However, because this more basic question is encompassed within the statute of fraud issue, the Court analyzes the case as presented to it by the parties.

Plaintiff begins by pointing out that the lease states that transfers of NYCW's ownership were considered assignments of the lease and subject to plaintiff's approval, that the stock agreement required NYCW to obtain estoppel letters, that Bruder wrote the letter representing that he was acting on behalf of Shaw and requesting the signing of the estoppel letter, and that these documents, along with the estoppel letter, acted as an assignment of the lease to defendant.

In North Carolina, it is permissible for several documents to be used together to satisfy the statute of frauds. <u>Satterfield v.</u>

-6-

Pappas, 67 N.C. App. 28, 35, 312 S.E.2d 511, 516 (1984).  However,
not just any set of documents can be used to satisfy the statute.
Instead, each document in the series must meet the requirement that
it be signed by the person to be held accountable in connection
with the document or by his representative.  Id.; Howlett v. CSB,
LLC, 164 N.C. App. 715, 719, 596 S.E.2d 899, 902 (2004).  Also,
each document must relate to the other documents and cannot predate
the agreement being memorialized.  Id. at 721, 596 S.E.2d at 903.
Finally, the documents must contain the essential terms of the
alleged agreement between the parties and the intent and obligation
of the party to be bound.  Id. at 719, 596 S.E.2d at 902.

     Here, the documents relied on by plaintiff do not meet these
requirements.  The lease agreement between NYCW and plaintiff and
the stock agreement between NYCW and defendant both clearly predate
the alleged assignment documents.  Also, the lease was not signed
by defendant.  Thus, to the extent plaintiff wants to use the terms
of the lease to bind defendant, it may not do so.  There can only
be an assignment if defendant signed papers agreeing to be an
assignee.  The stock agreement required NYCW to obtain consent to
the transfers from landlords such as plaintiff, but plaintiff was
not a party to this document and it gave no rights to plaintiff.

     Plaintiff wants to compare this case to Cary Crossroads
Associates, L.P. v. Atlanta Bread Co. Intern., Inc., 159 N.C. App.
465, 583 S.E.2d 428 (2003)(Unpub. Table - text in 2003 WL
21791832), where the North Carolina Court of Appeals found that a
letter notifying the landlord of a change in ownership could

-7-

possibly from the basis of an assignment. However, in that case, the original lease expressly mentions the franchiser and spoke to the situation where the franchiser took over the lease from the franchisee. Next, the franchiser notified the landlord that there was a transfer of ownership from the franchisee to the franchiser and the franchiser expressly sought to be billed for the rent. In that situation, the court of appeals could not say that the letter requesting to be billed did not constitute an assignment.

In the instant case, in contrast, the original lease does not mention, and defendant never at any time stated, that it was taking over for NYCW, much less requested to be billed for the rent. Moreover the estoppel letter was signed by plaintiff, not defendant. Nowhere in it does defendant agree to be an assignee or ask to take over the lease by being billed or otherwise. Thus, it is clear the estoppel letter cannot be the basis for an assignment under North Carolina law.

Nor can the Bruder letter support an assignment of the lease by defendant. The letter requesting consent to the transfer of NYCW stock by Bruder is signed only by Bruder. Assuming purely for the sake of argument at this point that Bruder would count as an agent of defendant[1], this letter would be signed by the party charged, in writing, and contemporaneous with the alleged agreement. Therefore, it could potentially satisfy the statute of

---

[1]The issue of whether or not Bruder is defendant's agent is hotly debated by the parties in relation to the statute of frauds question. Actually, as will be seen shortly, his agency or lack thereof does not affect the outcome of the statute of frauds analysis, but really relates more to the issue of estoppel. It will be discussed more in that regard below.

-8-

frauds if it properly memorialized the essential terms of the parties' agreement. Unfortunately for plaintiff, it does not. It merely states its purpose by asking that plaintiff sign the estoppel letter and notes that defendant is buying NYCW's stock and is a billion dollar, publicly traded company and leading manufacturer of floor covering products. The letter does not purport to be a memorialization of the terms of any assignment agreement between the parties. The letter makes clear that NYCW remains as the tenant.

When all is said and done, plaintiff has failed to produce either a single document or a series of documents that meets all of the requirements of the statute of frauds in order for the documents to constitute a contract. However, this does not end matters because plaintiff argues that, even if there is no contract for being barred by the statute of frauds or otherwise, defendant is estopped from asserting the bar and denying the assignment of the lease.

Both parties cite In re Covington's Will, 252 N.C. 546, 114 S.E.2d 257 (1960), as the applicable controlling law for equitable estoppel. It states that:

> the essential elements of an equitable estoppel as related to the party estopped are: (1) Conduct which amounts to a false representation or concealment of material facts, or at least, which is reasonably calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party afterwards attempts to assert; (2) intention or expectation that such conduct shall be acted upon by the other party, or conduct which at least is calculated to induce a reasonably prudent person to believe such conduct was intended or expected to be relied and acted upon; (3) knowledge, actual or constructive, of the real

-9-

facts. As related to the party claiming the estoppel, they are: (1) lack of knowledge and the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party sought to be estopped; and (3) action based thereon of such a character as to change his position prejudicially.

Id. at 549, 114 S.E.2d at 260 (citations omitted).

Plaintiff does not argue that defendant directly made any false representations. Instead, it construes the Bruder letter to "[indicate] to the Plaintiff that he was acting at the request of Shaw and that Shaw was seeking the consent to a change of ownership, constituting an assignment of the lease." (Pl. Brf. p. 14 – emphasis added) Because plaintiff fails to identify an actual misrepresentation, it must be arguing that Bruder deceived plaintiff into assuming that defendant was agreeing to become an assignee under the lease. To satisfy such a claim requires a significant amount of evidence that defendant knew plaintiff would only agree to the transfer if defendant agreed to be an assignee. Plaintiff must also show that it relied on the deception and thought that when it signed the estoppel letter, defendant was agreeing to be an assignee. Unfortunately, plaintiff does not present such evidence. It only produces the cover letter and the estoppel letter.

In addition, defendant denies that Bruder was its agent or representative and, therefore, contends that any misrepresentations he made cannot be held against defendant. This assertion appears to be correct. While his cover letter could certainly have given an impression otherwise, Bruder has filed an affidavit explaining that he was acting as counsel for NYCW when he sent the cover

-10-

letter seeking to have the estoppel letter signed by plaintiff. He specifically denies that he ever actually served as counsel for defendant or acted as its agent.

As a consequence, plaintiff points to Bruder's actions in requesting the estoppel letter and finds it significant that they were prompted by the stock agreement between defendant and NYCW. It also notes that his actions benefitted defendant by insuring that the entity it was purchasing could continue to operate in its present locations. While both of these things are true, this does not automatically make Bruder defendant's agent. The mere fact that one party contracts with another party to perform a task does not make them agent and principal. Nor does the fact that a party benefits from the actions of another create such a relationship. Instead, a principal/agent relationship is a "fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1(1) (2006). Plaintiff offers no evidence of such activity between defendant and Bruder.

The parties do not discuss the relationship of Bruder and defendant or NYCW and defendant in terms of fiduciary duties or control. In any event, nothing they have put before the Court would suggest that an agency relationship existed between defendant and either Bruder or NYCW. The contract between defendant and NYCW merely obligated each of them to perform certain tasks. One of the tasks obligated NYCW to attempt to get estoppel letters much like

-11-

a seller of a home will make repairs or secure guarantees at the request of a potential buyer.  It does not involve control by the defendant/buyer or a fiduciary relationship.  Bruder was the agent of NYCW hired to meet NYCW's contractual obligation, not an agent of defendant.[2]

Even if plaintiff could show that Bruder was defendant's agent, its estoppel claim would still not succeed based on the alleged misrepresentations.  Plaintiff first contends Bruder misrepresented that he was an agent of defendant.  This, however, is a bootstrap argument.  Certainly, his cover letter could be read this way.  However, if, as plaintiff has argued, Bruder was defendant's agent this was not a misrepresentation.  If it was a misrepresentation, then plaintiff fails to show why defendant should be held responsible for the act of a rogue third party.

A second misrepresentation alleged is that Bruder stated that defendant wanted plaintiff's consent to the transfer of stock.  However, given the stock agreement, this statement appears to be

_____

[2]Plaintiff makes contingent arguments that if Bruder did not have actual authority to consent to the assignment of the lease to defendant, then he had apparent authority and/or defendant ratified his conduct by later exercising rights under the lease.  However, apparent authority is associated with some amount of actual authority and here there is none. Ward v. Durham Life Ins. Co., 325 N.C. 202, 381 S.E.2d 698 (1989); Restatement (Second) of Agency § 49 (2006).  As for ratification, defendant did not later exercise rights for **itself** under the lease.  It merely arranged a HVAC maintenance contract for its subsidiary, NYCW, and also notified plaintiff on behalf of NYCW that NYCW wished to exercise the option to extend the lease.  The exercise of the option clearly identifies "New York Carpet World, Inc." as "Tenant" and states that "Tenant," not defendant, elects to exercise the lease option.  This phrasing of the letter exercising the lease option actually cuts against any argument for ratification.  Also, plaintiff has introduced no evidence to show that defendant and NYCW were so intertwined that the corporate veil should be pierced and they should be regarded as one entity.

-12-

true.  Bruder may have left out the fact that NYCW also wanted the consent and that it was really NYCW that hired him to obtain it, but these are peripheral, not material facts with respect to plaintiff's giving consent to the transfer.  The critical facts were that the sale of NYCW to defendant was happening and the consent was requested as a result of the sale.  These facts were not misrepresented.

Plaintiff's argument is based on plaintiff's view that Bruder misrepresented the nature of the consent he sought.  Plaintiff claims that Bruder was, in fact, seeking "consent to a change of ownership, constituting an assignment of the lease" but he actually only sought a consent to the change of ownership without an assignment of the lease to defendant.  The argument is not a tenable one, in that it seeks to substitute plaintiff's wishes and argument for Bruder's actual words and intent.  It is true that under the lease, a change in ownership of NYCW was to be considered an assignment of the lease requiring plaintiff's consent.  But, Bruder's letters did not seek consent for an assignment.  The only request specifically made in the cover letter is that the estoppel letter be signed and returned to aid the stock sale.  Bruder makes no representations regarding the extent of the consent being sought.  The nature of both Bruder's intent and plaintiff's consent must be determined from the estoppel letter itself and it does not cover assignment of the lease to defendant.

Because plaintiff attempts to use the estoppel letter as the contract between plaintiff and defendant which assigns NYCW's lease

-13-

to defendant, the letter must be read using the normal rules for interpreting contracts.  The Court's primary purpose will be to ascertain the intention of the parties.  <u>Glover v. First Union Nat. Bank of North Carolina</u>, 109 N.C. App. 451, 456, 428 S.E.2d 206, 209 (1993).  Also, the contract will be construed as a whole with each part being given an effect, but also being considered with reference to the other provisions of the contract.  <u>Marcoin, Inc. v. McDaniel</u>, 70 N.C. App. 498, 504, 320 S.E.2d 892, 897 (1984).

There is no question that the estoppel letter does not explicitly assign the lease to defendant.  In fact, the great majority of the provisions in the letter do not even mention assignment.  Instead, they merely state that there is a lease in effect between plaintiff and NYCW, that the lease is attached, that neither party is in default of the lease, that no security deposit is being held, that the rent on the lease is paid through June 1, 1996, and that plaintiff is aware that NYCW and defendant are relying on the representations in the letter.

Two provisions do mention assignments.  The first, paragraph 4 of the letter, merely states that plaintiff and NYCW (so far as plaintiff knows) have not assigned their interests in the lease.  This language cuts against plaintiff's argument because it shows that everyone agrees there was no assignment.  The other, paragraph 7 of the letter, is the provision on which plaintiff hinges its assignment argument.  It states in its entirety that:

> Landlord does hereby acknowledge and consent to a transfer of all stock of Tenant to Shaw Industries, Inc., a Georgia corporation, or a corporate affiliate thereof ("Shaw") and agrees that such transfer shall not be an

-14-

event of default under the Lease; provided, however, this
shall in no manner be construed to be a consent to any
<u>other</u> transfer or assignment of the Lease.

(Complaint Ex. C. ¶ 7)(emphasis added)

This paragraph, like the rest of the letter, does not
explicitly assign the lease to defendant. Nor is this the stated
purpose of the paragraph, which quite clearly is aimed at having
plaintiff consent to the transfer of NYCW's stock to defendant
without there being a default under the lease. Nevertheless,
plaintiff contends that the words "other transfer or assignment"
mean that defendant was agreeing and inducing plaintiff to agree to
both a transfer of the stock and an assignment of the lease to
defendant, but not to any other transfer and no other assignment.

Plaintiff's reading is not the most natural reading of the
phrase when it is viewed in light of the entire letter (especially
paragraph 4) and the entire body of paragraph 7. Given that the
letter as a whole never mentions something as important as the
assignment of the lease to defendant, except to deny there were any
assignments, and is aimed at receiving certain assurances from
plaintiff, it would be extraordinary to assume that such an
important detail as defendant allegedly agreeing to be an assignee
would be covered entirely by the phrase plaintiff suggests.
Equally important, paragraph 7 twice uses the term "transfer" to
refer to the transfer of NYCW's stock to defendant. The term
"other" is obviously meant to make a distinction between that
transaction and a possible future one. It does not refer to a
future assignment to the lease because none had occurred or been

-15-

mentioned in the estoppel letter. It may be that under the lease agreement a stock transfer could be deemed an assignment giving plaintiff the right to cancel the lease. However, nothing in the estoppel letter manifests defendant's intent to be bound by the lease itself or to be an assignee under it.

At most, it is possible that the language pointed to by plaintiff, along with Bruder's letter, could raise a slight question in plaintiff's mind concerning whether there was a possibility that defendant might accept assignment of the lease. However, this is not sufficient for an estoppel argument, because any reliance on what plaintiff perceived to have been an offer to accept assignment of the lease must be reasonable. Deal v. North Carolina State University, 114 N.C. App. 643, 645, 442 S.E.2d 360, 362 (1994). In a situation such as this, where nothing even resembling an explicit promise to accept an assignment was made and the plain language of all of the documents tended to indicate that none was intended, plaintiff's blind reliance based on hope, without questioning defendant further to definitely ascertain its intent, was simply not reasonable.

As a final matter, plaintiff has not provided sufficient evidence of lack of knowledge and means to acquire knowledge of the truth, nor evidence of actual detrimental reliance. This is true even if Bruder's conduct can be charged to defendant and even if his conduct included misrepresentations that could have lead plaintiff to believe that defendant was offering to accept an assignment of the lease. Plaintiff fails to show why it could not

-16-

have clarified the situation by a call to Bruder. It should have done so because, as shown above, the estoppel letter does not explicitly assign the lease to defendant.

Next, a plaintiff must show "reliance on the conduct of the person against whom estoppel is asserted, not merely that he or she was aware of certain facts which in retrospect might support the assertion of estoppel." Id. In his affidavit, one of plaintiff's two partners, Jerry Horne, explains the events preceding the signing of the estoppel letter. He tells of the receipt of Bruder's letter and of plaintiff's beliefs that it came from defendant, that defendant was a billion dollar publicly traded entity, and that defendant wished to assume the lease. (Pl. Brf. Ex. A. ¶¶ 5-6) He also relates how he confirmed defendant's existence and size by researching it on the internet. (Id. ¶ 7) He then states in a conclusory fashion that plaintiff "reasonably relied on the assertions of Mr. Bruder who was apparently representing Shaw Industries by the terms of the letter." (Id. ¶ 10)

What Horne's affidavit fails to state is that, but for its mistaken belief that defendant was requesting to have the lease assigned to it, the partnership would not have signed the estoppel letter. It does not state that it would have refused to consent to the transfer of stock or declared NYCW to be in breach of the lease. For example, if plaintiff had not signed the letter, it is difficult to see how plaintiff would now be in a better position. By signing the letter, plaintiff kept a paying tenant, and as it

-17-

turned out, for several more years.  A refusal to sign might have cost plaintiff that tenant.  If having defendant agree to an assignment was important, plaintiff fails to explain why it did not demand an explicit agreement from defendant even if that meant the possibility of losing a tenant.

The basic truth, behind plaintiff's estoppel claim, and its undoing, was best stated by Horne himself in his deposition.  When asked directly why he signed the estoppel letter, he replied, "Because we needed a tenant, and I assumed that if we didn't allow them to do that we would be--our building would have been vacant." (Pl. Brf. Ex. D. p. 35)  Whatever plaintiff's beliefs, the reasons for them, and their ultimate reasonableness, the reality of the situation was that plaintiff could either sign the estoppel letter and allow the lease to continue or refuse to sign it and risk losing a tenant.  It chose to do the former.  Plaintiff's course of action may not have worked out as well as hoped, but it has not shown that it would have done otherwise even if it knew defendant was not liable on the lease.  It has also not shown that it would have been in a better position if it refused to sign the letter. Its estoppel theory is really based on unfulfilled hopes, not detrimental reliance.  As such, it fails and defendant's motion for summary judgment will be granted.  This disposition makes it unnecessary to address defendant's statute of limitations defense.

**IT IS THEREFORE ORDERED** that defendant's motion for summary judgment (docket no. 17) be, and the same hereby is, granted and that this action is dismissed.

-18-

_____
**United States Magistrate Judge**

May 4, 2006